The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit, are admonished to draw a line and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Good morning. Welcome to the 4th Circuit. Judge Wynn, Judge Harris, and I are pleased to be hearing your cases, the first of which is Fleur Bresler v. Wilmington Trust. Mr. Shea. May it please the Court. I am Jim Shea and I represent Wilmington Trust, the appellant here and defendant below. This case was tried to a jury on a breach of contract theory in which plaintiffs sought to cash out on three life insurance policies, which are most easily referred to collectively as the insurance policies. The named insureds on these policies were Charles and Fleur Bresler and the death benefit was to be paid on the death of the second of the two to die. The premiums were 100% financed by loans. There were no payments to be made by the Breslers or any of their trusts. The trust held these policies as part of an estate plan for Charles and Fleur Bresler. The basis of plaintiff's claim was the manner in which Wilmington Trust handled these policies meant that the policies will or would be valued at death at a lesser amount. The central problem with plaintiff's case. By that you mean you would subtract the premiums that were paid by Wilmington Trust and that would yield what the balance would be or that the ultimate policies would be less than $50 million? They're saying because of the way we handled the policies that the death benefit net of the loans would be less than the death benefit net of the loans if we had handled the policies the way they should. They say we should have. Yes. So it all depends. The key point here is it all depends on second to die dying before you can start to compare death benefits and a payout at death. And that's the central problem with their case. When these arrangements were made and the policies purchased, they bargained for a death benefit paid at the time of the second to die. That time has not yet arrived. Fleur Bresler is still alive. We don't know today and we won't know until she dies whether the manner in which Wilmington Trust has handled these policies will cause a lesser recovery, any loss at all. Or if it does cause a loss, we don't know how much that will be. So you're testing the damages aspect of it, saying it's speculative or that you can't tell because you don't know when the person is going to die? No, I'm not challenging the damages aspect. I'm challenging the injury. There's no injury until the death occurs. I thought that the expert testified that to the contrary, basically, that no, the investment account has a current value and it's diminished by the failure to make the overall funding payments. There is testimony to that effect. It has this relevance in the case. The damage theory which the plaintiffs pursued was a comparison of net and trust value, that value that involves a death benefit, comparing the net and trust value of the policies handled the way they should, they say we should have, versus the way they were actually handled. Both sides of that equation involved net and trust. Net and trust is a combination of the account value but also the term insurance aspect, the $50 million payout. And because we've shown in our brief that that is the way they calculated it and that can't be calculated because there's no injury until the second to die, they then in their brief pivoted to say no, no, our theory is a lessening of the account value, the investment portion. But that doesn't work because the account value as of the time of trial, net of the loan, was a negative number. Does this sort of overlap onto your argument that the expert's testimony should have been excluded? Because otherwise I'm just having trouble figuring out why it's not just kind of re-litigating whether the expert was right or wrong when he said no, here are the damages. No, you should reverse and remand because the expert never submitted a report. That's true. That's a separate issue. But this is not an argument among. Which issue are you addressing here? You've got three primary issues. Which one are you focusing on now? The prematurity, the lack of injury occurring. Judge Harris asked about the expert. Based on a finding of a breach of the contract or failure to supply the collateral that you were supposed to be supplying? Their theory is that we were to pay $5.5 million into the policy each year. And we didn't do that. If we had done that. That would represent an over-funding. Correct. Correct. If we had done that, that would have generated certain values, including an account value, and ultimately at death, a death benefit. Is that what the jury found? The jury found, in accordance with the plaintiff's expert, and the plaintiff's expert was wrong. And not wrong because he had facts wrong, but because his theory was based on an injury that hasn't occurred yet. You can't compute the net in trust, that is, the death benefit of the insurance amount and the investment amount until someone dies. Isn't that the purpose? I'm sorry, Judge. Isn't that the purpose of the statutory mortality table? No. Why not? First of all, in the insurance industry, they're used for large numbers to be able to actuarially predict what the premium should be and so forth. As to an individual, they are used in damages because in the damages, the courts give leeway to a party who has been injured, gives leeway for a reasonable estimate of what the future damage would be. What the plaintiffs have here, they're asking for present damages for a future injury. They bargain to get these benefits. But you had the opportunity to present a witness to say that there was zero value. All the evidence shows we didn't have to present a witness. The plaintiffs' experts' own tables show that there was no net value in the account value column as of the time of trial. If Your Honor would like, we could look at page two of our reply brief, which shows you exactly how their calculations work. But my concern is that essentially what you're saying is anytime you sell a policy of this nature, if the person continues to live, there can never be a damages calculation. No, I'm not saying that. Okay. Then what are you saying? I'm saying the way they calculated the damages is improper because they factored in the death benefit, the face amount death benefit that is only accrued at the time of death. If they had compared the account value only as of the time of trial in accordance with their procedures versus what actually happened, they would have been able to show damages. Their only problem is at that point in time, the account value net of the loan was minus 2.8 million. So they didn't go that route, which would be legitimate, because it wouldn't have shown any damages. There was no injury at all at that point. Are you saying that Wilmington could breach this agreement, but the plaintiffs could not sue until a clerk died? That's what they bargained for, Your Honor. They bargained for benefits. How is that different from run-of-the-mill contract-type cases that would you deal with future damages? I mean, this happens all the time, in which there's a breach of the contract, and you make a calculation of damages based upon, as Judge McKeenan alluded to, maybe actuarial tables, future interests. It's done in this way by economists. We use expert testimony to do that. We don't wait until people to the event actually happen down the road from a breach of contract case. Your Honor, the breach of contract must lead to an injury. The injury then can be assessed as to what the damages are. We know they've been injured. It seems to me that you're trying to recharacterize this as a failure to sustain an injury when what you're really saying is that the damages cannot be quantified because they're speculative. No, I am saying that, but not just that, and not that most importantly. It could well be there are no damages that result from the way in which this policy was funded. As of the time of trial, there were no damages as of the time of trial, and the account value because of net up loan. But what could happen, what happens with these policies is as the insured ages, more and more of the policy premium goes into the cost of insurance. Right, and that's why overfunding became such a big issue, that if they hadn't been, the failure to overfund early becomes much more significant, does it not, during the course of these events? In the early years. In the late years, it makes relatively little difference because of both. And that's why they were saying it was so crucial to get that overfunding, and the patch agreement that you came up with didn't overfund, and that they had sustained damages. It's as if they're calling a swap in midstream, Your Honor. They're saying we're in the money right now because interest rates have been favorable, and she hasn't died yet, but we'll assume that she's going to die soon, and all of that would generate, if it all happened, a positive amount. But they are not able to show that injury is inevitable on this because as the cost of insurance increases, it increases dramatically as she ages. For example, the insurance company under the policies has the right to charge premiums, ultimately, when she's 99 years old, of $41 million a year. The cost of insurance gets exceedingly high as she ages. It will exceed the $5.5 million, but most importantly, that cost of insurance all has to be borrowed. And when it's netted out against both the $50 million face amount and even the account value that they say should be in there, the value is going to be zero. Now, these are non-recourse loans. They'll have to pay it themselves. So the value is zero, not some big negative number that the trust will owe, but there will be no injury in those circumstances. Can I ask you a question? The sort of relationship between the no injury argument and the speculative argument, did you break those out clearly for the district court? It doesn't look like the district court addressed this kind of separate, forget speculation, there's just no injury at all. We did make that argument, Your Honor. It was made in motions both immediately post-verdict as well as during the course of the proceedings. Perhaps you could give us an appendix cite for that when you return on rebuttal. I will, Your Honor. Thank you. But I will say, quite frankly, there was never any serious focus, not because it wasn't raised, but because the parties just didn't focus on this. Right, I didn't see a lot of focus. No, it wasn't. We all perhaps wish it had been. It was raised, and it's a very serious issue. This case got way off the rails because of the speculative nature, not just the speculative nature, forget speculative, the truth of we don't know whether there's been an injury yet. There may not be at the end of the day. Why don't we measure the net and trust shortfall, the difference between no overfunding and overfunding? Why isn't that a valid measure? Because it entails the death benefit of $50 million being paid. It's not ripe because she hasn't died yet. We don't know how much they're going to have to borrow to pay the premiums to the point of her death. If they have to borrow all of these enormous costs of insurance as she ages dramatically, then the loss will be zero. Can I ask you a question? At trial, was the plaintiff's expert crossed on this point? Why are you including the death benefit? So all of this played out in front of the jury. Well, not in so many words. He was questioned about whether the policies could go underwater, to which he said, yes, they can go underwater. But this is not a factual question, Your Honor. This is a pure legal question. They're seeking damages for an injury that hasn't occurred. As all of us struggle to understand it, a jury would have been completely baffled by it, and it wouldn't have been. I'm just saying that whether you can get damages for an injury that hasn't occurred is a legal question, but whether or not an injury has occurred seems more like a jury question. And this was all aired in front of the jury, right? You crossed the witness. You didn't put on your own witness to explain this. So I guess my question is, so why isn't this a jury question? All the facts show, the undisputed facts show, there's been no injury. They use a net-in-trust comparison. To get a net-in-trust comparison, you have to use the death benefit that will only be paid when the second to die occurs. She had not died and has not died. Until she does, it's what they bargained for. They bargained to get a death benefit at the second-to-die death. You're saying there's no consequence that would arise from a breach of this contract if you were to be overfunding at 5.5 and yet you were not doing that, that there would be no injury that would arise from that? Could happen. Could well happen, Your Honor. And it could, but isn't that a – it seems like something is patently wrong with that assertion, that you are to overfund a contract at 5.5 but you can breach it and just fail to do that and then say, well, you don't have an injury because we don't know when you're going to die and how long this policy is going to be there and whether it's going to increase up in value because of your age. So we don't know that right now. But what we do know is that you breached the contract right now. And we do know there's probably a consequence between paying maybe a million to less than you would in another circumstance. Your Honor, overfunding is not in and of itself a good thing. If the rates invert and the financing rate is greater than the crediting rate. Overfunding is not in and of itself a good thing. But we've got two very sophisticated parties here doing this little deal here. I wouldn't have done it. I'm not sophisticated enough to do this sort of thing. I certainly would have done it without a written agreement. But to be fair, as I say, banks are a lot smarter than the rest of us in doing these things. But you did it. And you did say you were going to overfund it and you breached it. And you now say, I don't owe you anything. I can breach this contract and wait until you sue her after she dies at 99. Your Honor, I'm not saying we don't owe them anything. I'm saying until there's a death, we don't know whether they've been injured or in what amount. And until then. You know, it almost seems, Mr. Shade, that the subtext of your argument here is we sold them such a bill of goods that they could never get anything out of it. Your Honor. You know, that's sort of what it sounds like. The reality of this, this is so far from a bill of goods incredible. They have a deal, according to the jury, where they get $5.5 million paid into the policy. They have no personal guarantee. There is no recourse. There is no collateral. There is no cash contribution. And at the end of the day, if there's a loss, the bank suffers it. If there's a gain, they take it. No question they have a sweet deal, but they're not dealing with a guy on the street out there. They're dealing with a bank. And they're dealing with a very sophisticated party on the other side. So you've got your reasons for doing this. We need not know that. But let me ask this last question, at least from my perspective. Is there a statute of limitations question if you can determine a breach is occurring now? And even if it's a continuing breach, does the statute of limitations indicate you can only go back so many years? If you know of a breach right now and you don't sue until 15 years later from when she died? Your Honor, it has to be an actual injury for the cause of action to accrue. Limitations doesn't run. The cases you see where there's discovery of early damages occurring could accrue a cause of action. But here, there's no question. If they're suing on the death benefits, it's when she dies they're entitled. It's the contract they made. Can you just explain? So you're also challenging that. Tell me why they couldn't sue. The injury hasn't accrued right now, even under your theory, as to the account portion, the investment account? Well, they could have, but they didn't because they would have gotten a negative number. Net of the loans they would have had to take as of the time of trial, their account value was almost $3 million less than the loans. Is that what their expert said to you? Yes. It's in his chart. That's where we get it. It's on page two of our reply brief. If you look at it across the line, it's a negative $2.8 million account value net of the loans. That's why they didn't sue on that theory because they wouldn't have recovered anything. Okay. Is specific performance a remedy that could be awarded to you? Yes. And would that be that you have to then fund at the super fund level? Yes. And would that be damages for failing to have done so? No. If you had not done it? No. Not until she dies. Then we'll know what the consequence is. For the years you were supposed to be doing it before the suit, would that not be damages that would arise? Not necessarily. Overfunding could be a very bad idea. You just said there's a breach. Assume there's a breach. Right. Let's say you go 10 years. You're supposed to be paying the super fund and you haven't done it. Policy hasn't gone up like it's supposed to. None of those things have happened. And at that breach, the question they said, we want specific performance. Right. Start funding at $5.5 million. And you just get away with not doing it? No, we don't. If they're damages that have accrued for that first 10 years? Yes, for now. Exactly. With what the parties bargained for. Give me a case that does that. The Learned Hands case on an annuity. That's it. With this type of policy? Absolutely. It's an annuity contract. And the question was, could the plaintiff cash in halfway through in the annuity contract to get his benefits now? And the answer from Learned Hand was no. He had to wait until the annuity benefits accrued. The Delaware case that we cited, there's a breach. Even though the breach occurred, you don't measure damages until the actual injury occurs. That's Amgen. That's the law, Your Honor. It is, but those cases are really very distinguishable. But I'm sure I'll hear that from the other side. I would like to reserve some time for rebuttal. I'm not sure how I'm doing on that. But I'm sure you'll tell me. Thank you all. Thank you. Mr. Mussolino? May it please the Court, Your Honor? My name is Phil Mussolino. I represent Sid Bresler. Fleur Bresler is the personal representative of the estate of Charlie Bresler. And let me direct my attention to the prematurity argument that took the entirety. I mean, that's the real rub in this case, isn't it? I don't think it's a rub, Your Honor, if I may. I mean, that's where the parties are truly joined, it seems to me. You know, you have the discovery issues, the different things. But this is the meat of the case, isn't it? Well, it is up here. It wasn't below. The only suggestion that was made to the jury on this whole subject was in Ms. Amber Coppolis' closing when she pointed out that we don't know when Fleur will die. Well, now, Mr. Shea is saying, though, that he made motions to the Court post-trial arguing that no injury had occurred. Correct. Is that correct? That's correct. But your question to Mr. Shea was the question that I think he had some trouble answering, which is this is a fact question. As we point out in our brief, there is ample opportunity for Mr. Shea to put on all kinds of evidence that will cast into doubt what is the evidentiary core of this case on this issue, which are the mortality tables. The mortality tables aren't just measures of damages. The mortality tables are even using learned answers. It uses the word injury in terms of being an element of the contract. It says it doesn't show injury. And the injury? You won't know the injury until Ms. Fleur dies. No, we can't necessarily collect on the death benefits until the future. But the case law doesn't say that an injury is limited to the events that have already happened. Case law constantly is addressed at issues which are going to occur in the future. In Lerned Hand's case and the other case there, he says those cases are all poor, dealing with a newer contract. In Lerned Hand's case, he awarded money judgment. In Lerned Hand's case, the plaintiff was a woman who was injured in a railroad accident in 1903, settled with the railroad company for $10,000 plus $700 a month for the rest of her life. An annuity in effect, but a settlement agreement. What Lerned Hand did in 1937 in the Second Circuit is he said, I have two measures of damages. I'm going to pick one. One is using mortality tables to project into the future, apply the $700 a month over the life expectancy and reduce it to the present value. Something that he acknowledged was done all the time back in 1937. He said that involves probabilities, a word which is now all over our approved future damages calculations. What he did is he said, I'm going to select the damages number. I'm going to accept evidence that says, what is the cost of an annuity that the plaintiff can get that will pay her $700 a month for the rest of her life? And he took testimony on the cost. He awarded at the trial, he affirmed an award at the trial, of a money judgment in a specific dollar amount based on the testimony that showed what the cost of the annuity would be in the future. As an award of damages for this disabled woman's $700 a month settlement agreement. So you can say that Judge Hand didn't like mortality tables back in 1937. We're way past that point. And we'll go over that if we have to in a second. But let's take Judge Hand's view of the law back in 1937. His view of the law is, we don't have to wait for this poor woman to die until we award her damages, which she won't have any use for because she'll be dead. Well, I will say your explanation of the case points in a different direction. I actually support your case. Your explanation is different. And Mr. Malino, I'll make sure I'm getting that right. Mr. Malino, in your presentation, as I understood the witness, Mr. Pugh estimated the net and trust shortfall as of trial at $10 million. Correct. Now, Mr. Shea is saying zero was the amount. No. What's going on here? It's hard for us to figure out the law if you guys are fighting on the facts. There is a missing component of the description so far of the nature of the transaction. Okay. Is it correct that Mr. Pugh said that the net and trust shortfall was like $10.7 million? Yes. After the date of trial, then he did his projections for the life expectancy going forward. This is an increasing death benefit policy. The reason you're overfunding, meaning paying more than the cost of the death benefit, of the life insurance, is because there's an investment component to the policy, meaning, as their witness, Mr. Gibson, testified, dollar for dollar, every dollar that gets earned in the investment component of it gets added to the death benefit. So what starts out as a $50 million death benefit on day one, assuming they overfund, increases over time as the spread between the rate that you're borrowing the money at, just increases according to the interest rate being paid by the insurance companies, the minimum in this case being 3.57, the average through the first 10 years being over 4%. The insurance companies are paying interest on the money that gets invested over the cost of insurance. And the income that's generated by that excess investment, if you will, creates the account in the first place that you've talked about. So Mr. Shea points out that it was negative. It's only negative in comparison to the second part of the transaction, the loan. But to add a number to the proceedings here, as of the date of trial, Mr. Pugh showed there would have been $54 million in cash in the insurance accounts. Not minus 2 million, but 54 million. The minus 2 comes from the fact that Wilmington is making loans and has a security interest in the insurance policies. That doesn't mean there isn't value to the accounts. There's $54 million in cash. Sometimes better to have cash in debt than no cash in debt. But if at that point in time Laura and Charlie pass, their death benefit wouldn't have been $50 million. It would have been $50 million plus the $54 million that's in that account, minus the various surrender charges that insurance companies manage to impose on people. Those two changes occur dollar for dollar with each other. So the injury that's being sustained is being sustained immediately in the account and is being sustained immediately in the death benefit because, as you pointed out, the failure to make the payments in years one, two, three, and four doesn't just have an effect in years one, two, three, and four. It has a long-term effect over the life of the policy. So Mr. Shea says, well, but still, your only benefit in this transaction is the death benefit. So since you haven't died, you don't have a lawsuit. If that becomes the rule, any claim of future damages that has, as a component of the measure, the life or death of the plaintiff, because that's what we're talking about, there's no way to parse Mr. Shea's theory from any case that involves a projection of death or a projection of life without accepting his theory. It becomes speculative and it becomes no injury. In this particular case, we would still not have gone to trial. Charlie Bresler, who passed during trial, would not have been deposed. We would now be, since Ms. Bresler is going to last for many decades, we would now be 30 or 40 or 50 years from trying events that happened in 2003, simply because the defendants chose not to challenge the factual significance of the mortality tables. The mortality tables were admitted without objection, and they allowed the jury to reach a finding, namely that it is likely, it is more likely than not, that Flora Bresler will live for 6.1 years or so. And the rest of the evidence shows when that happens, the value of the death benefits will be as the expert calculated. So unless we're going to dispense with all of the cases where future damages are based on some projection of an event happening in the future, future loss cases in a variety of cases, including medical expenses, front pay and employment discrimination cases, employment disability cases, future profits, all of them have some future component that someone can argue hasn't occurred yet. It's the same argument. Right? You're saying he could have joined the issue directly in front of the district court by objecting to the use of the mortality table? He could have first objected, and that was your question, Your Honor. It wasn't a good answer for it. He certainly could have come in, and we cite cases that say, in our brief, of course you can come in and challenge not just the mortality tables. You can put on evidence unrelated to the mortality tables that show other contingencies, the prospect of nuclear war, the fact that the insurance companies were going to go out of business, the fact that Floor was engaging in activities like skydiving that are outside the scope of the policy. There were a variety of things that the defendants could have done to take what was an admitted piece of evidence sufficient to go to the jury and establish not just the measure of damages but the fact of damage. Let me ask you a housekeeping question. You seem to agree that Delaware law applies, but yet I see cites to Maryland law. Does this make a difference in this case? There's no difference that we can find between Delaware and Maryland law on this subject. Then what are we applying? There is more Delaware law, I will say that. There is simply more Delaware law on the subject, and we cited them in our brief at page 20, and we can cite some recent cases on the same subject. Let me just say, for instance, we cited a case called Henney v. Bailick, H-E-N-N-E v. Bailick, which was just recited in a Delaware Superior Court case, which I'll cite if the court is interested. I just want to read the language because it clarifies this issue. This was just decided in September of 2016. All that is required is that there be some reasonable basis upon which a jury may estimate with a fair degree of certainty the probable loss which plaintiff will sustain, not has sustained, but will sustain in order to enable it to make an intelligent determination of the extent of the loss. That's a case called Lisowski, L-I-S-O-W-S-K-I v. Bailick. I think there's a Rule 26 issue on your expert, Robert Pugh. Yes, Your Honor. Mr. Pugh testified and gave a report in June of 2012 in which he put in his formulas and put in his report that he hasn't included in his calculation or in his formula various deductions and various costs. He put it in his report. Mr. Stevens put in his July counter report that cost of insurance issues and lending rates have to be deducted from sort of the gross numbers that were in Mr. Pugh's formula. Mr. Pugh is deposed in September of 2012 and is deposed on the subject of swap rates being used as a way to determine future lending rates. We're talking about the five-and-a-half-page expert report, Peter? That is the one that you said that provided the three calculations? That's the one? Yeah, the four calculations. The June 2012 report, right. That's what was submitted in compliance with Rule 26? Yes, Your Honor. So what Mr. Pugh did was he took Mr. Stevens' numbers, because Mr. Stevens had access to information that we didn't have access to, including the crediting rates and including Mr. Stevens' projection of cost of insurance, and he used them to do the deductions from his numbers. And that's what we produced in we pointed that out in our proposed pretrial order, and he provided a spreadsheet that did those calculations. So he plugged numbers into this initial report. What did he get? Did he get the net interest? Yes, Your Honor. And that did that? I'm plugging those numbers in there. He took the Stevens' numbers for cost of insurance, deducted them from the five-and-a-half million dollars that was going to be paid under the original agreement, and then applied the interest rate calculations that were also provided by Mr. Stevens, and then from there deducted the loan amounts that constituted the cost of financing. So you're saying the net in trust, the calculation is in the initial report?  But net in trust, Your Honor, is just the formula in that initial report. In other words, how would you plug it in? It means you've got a formula sitting in front of you, and then all you need is some numbers. You've got that formula in that initial report, and then you've got another one. You didn't take those numbers and plug it in. Are you saying to me that that formula is not in that initial report? The only formula that needed to be in the initial report was that. My question is, is the net in trust formula in the initial report? Well, it is and it isn't. How did you get it? It's a formula that doesn't exist. As he said in his report, those are costs and expenses that he didn't include. That's what he says in his report. And when Mr. Stevens in July of 2012 says, well, I have the cost of insurance numbers, all Mr. Pugh has to do or Mr. Stevens or the jury has to do is subtract the cost of insurance numbers from the $5.5 million times the crediting rate. So could you have given these calculations earlier, the net in trust calculations? Earlier than November, they were still being developed, Your Honor, but what we would have done at trial and what ended up happening at trial is that we would put Mr. Stevens on and his charge to do the deductions and do the calculation from there. That's why, as we point out, we have a series of different pieces of evidence in the case that establish damages. We have the projection, Exhibit 42. It shows the $46 million net in trust. It should have been in the policies as of November of 2013. That's a WTC projection that was admitted without evidence. Standing alone within percentage points of Mr. Pugh's calculation. The chart attached to it, which also admitted into evidence, shows the same damages going through Flora's life expectancy year by year. That evidence was already in. We could have put and we had Mr. Stevens on our witness list and we had his report on our exhibit list and he testified and his report was moved into evidence. We could have put Mr. Stevens on the stand and said here's your report. Are you essentially saying you complied with Rule 26? Yes, Your Honor. And to the extent that there was any... An expert was put on the stand, he testified, confused everybody, was sent out, came back with a whole new calculation and that calculation is basically identical to what the jury ultimately came up with. Rule 26 is pretty specific in which it requires, and I should say fairly unfortunately, there's an ancillary rule to it that if you don't comply with it, you exclude it. All right, Your Honor. Let me just talk about the events when Mr. Pugh stepped down. There were two issues that were raised. There were two events when he was on the stand. He was on the stand and he was there. He was there testifying about a lot of things. It wasn't the same thing in his report. He was going back and forth on this. His values began to change three or four times. The judge said, I'm confused. I guess he looked over at the jury. He said, I don't know if I'm confused. Everybody in this place is confused. They sent you out and you came out. It magically comes back in. I guess it's something that is more well thought out. Puts it on the stand. My question goes to the Rule 26 aspect of that. Because Rule 26, at least some circuit courts have said, you really have to comply with this before a deposition. Gives everybody a chance to kind of question and talk this thing out and look at these numbers. But when you're making these numbers up, or at least calculating them on the stand, under the guise of I'm plugging in to a formula that doesn't exist, I'm confused here. So the numbers were plugged in three months before his testimony. Not on the stand. So they had the spreadsheets back in November. The motion was made to exclude before the trial, and it was made because it wasn't provided before the deposition. Right, and that motion was denied by the judge. Denied twice. But the review is an abuse of discretion. Right. And he could abuse of discretion if it was not, if Blatant did not comply with the Rules and tell you what the remedy was. Well, the Rules says there are a number of remedies that can be applied, depending on a measure of, in this particular case, prejudice or lack of prejudice in the five factors in southern states. In this case. None of which he discussed. Not one of those. Pardon me? He didn't discuss any of that. None of that. No, but southern states. None of that came out of this. No, but southern states was briefed by both parties in response to the Daubert. The trial judge did not even raise it at all. I mean, his voice, I'm not even sure he even thought about it. Well, I think it's pretty clear that Judge Macitti, who had this motion filed and was raised in the Daubert motion, not in the reply, but in the Daubert motion, because the issue had been plagued in our pretrial statement. It was raised and it was argued on December 17th. The transcript, December 17th, Mr. Crimmins for Wilmington made his argument and Judge Macitti denied the motion. It was raised again mid-trial and then, of course, it was denied again. It was raised again post-trial in the exercise of his discretion. And the exercise of his discretion included his saying to the defendants, of course, you can have a deposition if you need one. No deposition was ever asked for. What did he say then? He said that at the January 3 hearing. Of course, you can have a deposition if you need one. Right. And counsel apparently didn't need one. And they didn't need one because they had made, honestly, a tactical decision, as we point out in our brief. But if there had been a failure to comply with Rule 26, I think it's Rule 37, tells you what the remedy is. No failure to comply with Rule 26 with respect to the initial report in June of 2012. The only question that was raised by Wilmington was whether the October-November spreadsheets and the bar graph applied as a supplement or some other version. Well, did the spreadsheets contradict in any respect the information in Pew's 2012 report? No. In Mr. Pew's 2012 report, he says the only thing he changes is the life expectancy. It was seven years in his 2012 report, and it's now reduced to 6.1 years because time has passed. And in his deposition in September of 2012, I believe he referred to the Wall Street Journal as a source for getting swap rates. In his report, he had the swap rates for years and years and years from the Federal Reserve. But it's the same numbers, just a different source. Let me ask you a much more basic question, and I think it's what Mr. Shea is getting at while you're winding up here. Why are the beneficiaries entitled to damages when the policy benefits haven't actually vested? You know, when we think in terms of policies vesting. What's your best answer to that? The policies haven't vested. They just haven't paid off. Vesting in the sense that no more premium payments are made at age 100 or whatever is a different term. These were contractual rights, these policies. You're saying that what we do, we don't consider the ordinary life insurance concept of a policy benefit vesting. No, Your Honor. You're saying that's a false measure. I just want to make sure as you're winding up to give us a more kind of global view of what you're saying here. All right. It may be a semantic issue, Your Honor. These three policies vest at various points in the future, age 100, 104, 105, meaning the life insurance benefits are fixed and no future payments are required. That's how I'm interpreting the word vest. In terms of immediate obligations, the insurance companies have immediate obligations. There are immediate obligations with respect to the cash value of the accounts. As their expert testified, these are being- You're saying they had to-I don't mean to cut you off, but you're saying they had a right to benefits outside the classic vesting of a life insurance policy. Yes. Okay. And what I'm saying is that simply because the actual obligation to pay isn't going to occur until six years in the future doesn't mean that a jury can't calculate that an injury is going to occur so long as there's a reasonable basis for making that conclusion. Okay. Let me see if the other judges have questions here. Judge Wynn. Okay. Thank you very much. Can I just say one- Well, you've been running over the clock for a while. So I think probably not. But thank you so much. Mr. Shea. Yes, Your Honor. I've lost track of how much time I have, so let me think of something. Yeah, sure. I'm not sure. I believe- Why don't I go until you tell me I have to stop? Well- Those lights will tell you. Yeah. The light will tell you, and Ms. Mannion won't. How much time does Mr. Shea have? Probably- He's got for seven. Okay. Okay. Thank you. Well, you asked for a cite to the record on the preservation, JA-1214. It's a motion for JNOV, page 27. Okay. Thank you. On the point about Mr. Pugh, Your Honor, the key document here is Pugh's report of 2012. It doesn't have any formula. The only formula that it has is a present value formula. He takes a stream of $5.5 million payments from 2004 to 2019, and he computes the total, and he brings the future payments back to present value. That's the only formula in that report. It doesn't have anything about cost of insurance. It doesn't have anything about net and trust. It doesn't have the methodology of comparing net and trust if it's overfunded. It's a complete breach of rule 26. Absolutely, Your Honor. It is complete. It's a complete breach, the flagrant breach. The spreadsheets that were dumped on us a couple months before trial, November for a then-scheduled December trial, they don't have any opinions in them either. They don't have any reasons. They don't have any data. They're a bunch of spreadsheets. Did the trial court ask you or indicate that you could go ahead and take depositions again? The trial court said that in early January with the trial about three or four days away, Your Honor. The deposition doesn't cure a rule 26 violation. And there would have been a no point in it. This man, Pew, changed his opinion every time he opened his mouth. He changed his opinion for the pretrial order. He changed his opinion in 174, which was before trial. He changed his opinion during trial. From 174 to trial, he changed his opinion. And then he changed his opinion from day one to day two. We could take a deposition at any time, and we wouldn't have had the final answer. And the final point on that, Your Honor, is we're not allowed to take a deposition under Rule 26 until we have a report. That's in Rule 26 itself, and we never had a compliant. I've not seen a case out there that has found an abuse of discretion of a judge in this kind of case. There are two. I haven't found an abuse of discretion. I've seen them the other way where the judge ruled the other way and then it came up. There have been. There's one in the First Circuit. There's one in the Eighth Circuit. And this court, in an unreported opinion, did the same thing in the Campbell case. They're all cited in our brief. So if you'd had the formula from the report, what would you have done differently? We didn't have a formula from the report. No, I said if we had. Oh, I'm sorry. I'm sorry. I'm trying to get at the prejudice. If we had done differently, we would have to know what he was plugging into the formula. He says he took it from our expert. We didn't know that. He didn't tell us that. He didn't tell us what he was getting from our expert. We had no concept of it. If one reads carefully the spreadsheets and then tries to figure out where the numbers came from, it's possible that we would have concluded that it came from Stephen's report. But he didn't tell us that. That's what you're supposed to get in a report. Now, before I'm dismissed, let me just make a couple points. First of all, this point about the need for an injury, Judge Hand's case says there are two choices. In this annuity, you could take the value of the annuity as of the time of trial and compare it to what the plaintiffs say the value was. But you can't take the future point. If plaintiffs had taken the value of these policies as of the time of trial and compared them, they could have done that. That would have been a legitimate damage theory because they would have had an injury. There are no damages there. They didn't pursue that theory because the damages are very, very, very small. But whatever, they didn't pursue it. Your Honor asked whether I said that there was no damage as of the time of trial. I must have misspoke, Your Honor, because what I said was if you use the net in trust shortfall, you can find a damage because you're using the not yet vested death benefit. But if you're just using the account value, the cash surrender value, there's no damage there. In other words, if you use this other theory that they didn't pursue, and the reason they didn't pursue it is it showed no damages. What about the, and I don't mean to cut you off, but I want to make sure you don't depart the building before I ask, Delaware law or Maryland law? Delaware law. It's in all three of the contracts have a choice of law provision. Because I did see some Maryland argued. Yes, yes. That happens in our state, Your Honor. There's also an important case that I didn't mention. It's in our brief, the Viglas case out of the Supreme Court. It's followed, that case is followed in this court in Beeman versus Pacific Mutual Life, 369F2nd653. And Viglas says exactly what I've been saying. If you have an aleatory contract, that is a contract that has a condition that has to occur before the value of the contract goes to the promisee, you have to wait until that contingency occurs. That whatever the situation, breach or not, as of the time of trial, if there is a contingency still to happen, you have to wait until that happens. This is an injury argument, not a damage argument. And the final thing I'll say, Your Honor, is that these premium policies, benefit policies, they're a bet. You're making a bet that's based on several variables. Variables that include these interest rates, if they invert against the beneficiary, you're in trouble. If the insured lives a long time, you're in trouble. And that's why our argument that that $5.5 million term that the jury found, there's no evidence to support it, none. If you look at the evidence underlying it, all the mentions of $5.5 million were accompanied by a need for collateral. The $5.5 million as a rope, year after year, is not the way this is set up. Plaintiff's own expert, Pew, said, no, the trustee exercised discretion each year. The $5.5 million might almost surely will not be enough to cover the cost of insurance at some point. Cost of insurance will exceed $5.5 million. This is not a, this is a factual argument, but it's a matter of law, because there is no way that this evidence supports the finding of a $5.5 million payment each year. Their own expert said that doesn't work. So, in conclusion, Your Honor, this is a contract that no reasonable commercial party would enter into. No collateral, no personal guarantee, no contribution from the wrestlers at all. Well, they gave $5 million in collateral, right? And then they took it back. They gave $3.7 up front and then they gave the patch collateral. And then they got it back when he died or as ordered. That's part of the contract that's been found, that that collateral was returned to them. So, in effect, we have no collateral, and there could be tens of millions of dollars of losses that Wilmington Trust will have to offer. What about the interest, though, that Wilmington would have received? I mean, why isn't that a reason why they would have made the bargain? Well, it's all their money. So, when they get commissions, which is what the plaintiffs argue, that's all coming from the loan money. So, it's really just an acceleration of prepayment of principal. The reason this is not commercially reasonable is Wilmington Trust takes 100% of the risk and the wrestlers take zero. The wrestlers take 100% of the benefit and Wilmington Trust gets none. Another reason is that you had a rather zealous employee. We did, Your Honor, and that's a reason they knew that, and that's a reason why this sophisticated developer represented by counsel should have known that Wilmington Trust was not making the offer like this. Was promising something it could never deliver? I mean, that's not how contracting parties usually operate, is it? No, and we have case law that when the promisee has reason to suspect that the person making the offer is not authorized, they cannot jump on a bargain that's too good to be true. I'm sorry. You're saying that they should have known that that guy who worked for you was kind of a crook? Yeah. That's your argument? That's my argument. So, you guys send out crooks and then it's on the consumer to figure out who? No. Look, nobody's happy and we're not proud of having somebody who misrepresented the collateral rules. That's not the position, and if there's a punishment that's to be meted out, fine. But a contract like this is not a punishment. This is run amok. This is a contract that they've seized on, and I honestly don't think they thought there was a $5.5 million term. They never asked for a $5.5 million term in a letter until well after trial started, and if you look at their complaint and their amended complaint, they never alleged there was a $5.5 million payment term. Never did. Thank you, Your Honor. All right, sir.
judges: Barbara Milano Keenan, James A. Wynn, Jr., Pamela A. Harris